UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF UBS COMMERCIAL MORTGAGE TRUST 2019-C17, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2019-C17, acting by and through its special servicer, Rialto Capital Advisors, LLC, as Special Servicer under the Pooling and Servicing Agreement dated as of October 1, 2019, <br><br> Plaintiff, <br><br> v. <br><br> 36th STREET PROPERTY INC.; HR 442 CORP.; AE SOOK CHOI; JIN SUP AN; NEW YORK CITY DEPARTMENT OF FINANCE; NEW YORK CITY ENVIRONMENTAL CONTROL BOARD; NEWBANK; and "JOHN DOE NO. 1" TO "JOHN DOE NO. 100" inclusive, the last one hundred names being fictitious and unknown to plaintiff, the persons or parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint, <br><br> Defendants. | Civil Action File No. <br><br> _____ <br><br><br><br><br><br><br><br> **COMPLAINT** |

Plaintiff Wilmington Trust, National Association ("Trustee"), As Trustee For The Benefit of the Registered Holders of UBS Commercial Mortgage Trust 2019-C17, Commercial Mortgage Pass-Through Certificates Series 2019-C17 (the "Trust"),[1] acting by and through its special servicer, Rialto Capital Advisors, LLC ("Special Servicer"), as Special Servicer under the Pooling and Servicing Agreement dated as of October 1, 2019 (the "PSA"), states its complaint as follows:

---

[1] Trustee, as trustee of the Trust, shall be referred to hereinafter as "Plaintiff".

527548.000033 24577037.4

## **PARTIES, JURISDICTION AND VENUE**

1.      Trustee, acting solely in its capacity as trustee of the Trust, is a national banking association with its designated main office located in Wilmington, Delaware.

2.      Trustee is the duly appointed and presently serving trustee of the Trust created under the PSA.

3.      Trustee, not individually, but solely in its capacity as Trustee for the Trust under the PSA, acting by and through Special Servicer, brings this action with express reference to the Loan (defined below) and the matters related thereto as hereinafter set forth.  Based upon Delaware being the state of citizenship of Trustee, Plaintiff is therefore a citizen of Delaware.

4.      Defendants 36th Street Property Inc. ("Owner Borrower"), and HR 442 Corp. ("Operator Borrower" and, together with Owner Borrower, "Borrowers") who, upon information and belief, are New York corporations both with an address of 442 West 36th Street, New York, New York 10018: Attention: Ae Sook Choi and citizens of New York, are named herein as defendants herein because they are the obligors of the subject note, mortgagors of the subject mortgage and owners of the real property located at 442 West 36th Street, New York, New York 10018, improved by the Hudson River Hotel, a 15-story, 56-room, limited-service lodging facility (the "Hotel"), and more particularly described in Exhibit A annexed hereto and made a part hereof (the "Property") that are the subjects of this action.

5.      Defendant Ae Sook Choi ("Choi") who, upon information and belief, is an individual with an address of 221-64A Horace Harding Expressway, Bayside, New York 11364 and a citizen of New York.

6.      Defendant Jin Sup An ("An") who, upon information and belief, is an individuals with an address of 1815 215th Street, Apartment 7D, Bayside, New York 11360 and a citizen of New York.

2

7.      Defendants Choi and an (collectively, "Guarantors") are named as defendants herein because they guaranteed Borrowers' obligations with respect to the Loan pursuant to the Guaranty (as defined herein).

8.      Defendant New York City Department of Finance who, upon information and belief, is a municipal entity maintaining an address at 1 Centre Street, New York, New York 10007 and citizen of the New York, is named herein as a defendant herein solely because of any title or claim it might have against the Property as a result of any unpaid New York City business corporation taxes and to extinguish such right, title, claim or interest in the Property.

9.      Defendant New York City Environmental Control Board who, upon information and belief, is a city department maintaining a principal place of business located at 100 Church Street, New York, New York 10007 and citizen of New York, is named a party defendant herein as a possible judgment creditor of Owner Borrower as a result of that certain judgment dated November 21, 2019, in the original amount of $1,450.00 and stemming from ECB Violation No. 011684323L, concerning the Property.

10.     Defendant NewBank who, upon information and belief, is a banking corporation duly organized and existing under the laws of the State of New York and citizen of New York, is named herein a defendant herein solely because of any title or claim it may have against the Property as a result of that certain mortgage, dated November 15, 2019 and in the original principal amount of $1,100,000.00, that NewBank recorded against the Property on November 21, 2019 with the Office of City Register of the City of New York (the "City Register's Office") as City Register File Number ("CRFN") 2019000381383 (the "Subordinate Mortgage").

11.     Defendants John Doe No. 1 through John Doe No. 100, inclusive, are fictitious and unknown to Plaintiff and are named herein to designate any and all tenants, occupants, persons, corporations or other entities, if any, having or claiming an interest in or lien

upon the Property or any part thereof, which is subject to the lien of the Mortgage (as defined in Paragraph 17 of this Complaint).

12. Based on the foregoing, this Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(2) because it is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13. Based on the foregoing, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

14. Plaintiff brings this action to foreclose a mortgage in the original principal amount of $14,200,000.00 that is secured by, inter alia, in the Property.

## FACTUAL BACKGROUND

## FIRST COUNT
### (Mortgage Foreclosure)

**A.    The Loan**

15. Pursuant to that certain Loan Agreement dated as of September 3, 2019 (the "Loan Agreement") executed by and between Borrowers and Ladder Capital Finance LLC ("Original Lender"), Plaintiff's predecessor-in-interest, Original Lender made a loan to Borrower in the original principal amount of $14,200,000.00 (the "Loan").

16. To evidence its indebtedness under the Loan Agreement, on or about September 3, 2019, Borrower executed and delivered to Original Lender that certain Consolidated, Amended and Restated Promissory Note in the original principal amount of $14,200,000.00 (the "Note"), payable on the sixth day of each and every month (the "Monthly Payment Date") from October 6, 2019 and continuing until September 6, 2029 (the "Maturity Date"), at which time all unpaid principal, accrued and unpaid interest and all other amounts due under the Loan Documents (defined below) (collectively, the "Debt"), would be due and payable in full, unless earlier

4

accelerated.  The Note provides for non-default interest at the rate of 5.20% per annum (the "Interest Rate")

17.     To secure payment of the Note, on or about September 3, 2019, Borrower executed, acknowledged and delivered to Original Lender, that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of September 3, 2019, and in the original principal amount of $14,200,000.00 (the "Mortgage").

18.     On September 6, 2019, Original Lender duly recorded the Mortgage against the Property in City Register's Office as CRFN 2019000286575 and duly paid the mortgage recording taxes.

19.     By the Mortgage, Borrower grants a security interest in favor of the holder of the Mortgage in, inter alia, the Land, the Additional Land, the Improvements, the Equipment, the Fixtures, the Personal Property, the Leases and the Rents (all as defined in the Mortgage) (collectively, the "Collateral").  The Collateral is more particularly described in Exhibit B annexed hereto and made a part hereof.

20.     As additional collateral security for the payment of the Loan, Borrower executed, acknowledged, and delivered to Original Lender an Assignment of Leases and Rents dated as of September 3, 2019 (the "ALR") pursuant to which Borrower, inter alia, granted to Original Lender a security interest in all Leases and Rents (as defined in the Loan Agreement) generated by the Property.  On September 6, 2019, Original Lender duly recorded the ALR against t in City Register's Office as CRFN 2019000286576.

21.     To perfect its interest in the Collateral:

a.      On September 6, 2019, Original Lender recorded a Uniform Commercial Code Financing Statement with the City Register's Office as CRFN

2019000286577 (the "Owner Borrower County UCC-1").  The Owner Borrower County UCC-1 names Original Lender as the secured party and Owner Borrower as the debtor; and

b.      On September 12, 2019, Original Lender recorded a Uniform Commercial Code Financing Statement with the City Register's Office as CRFN 2019000293842 (the "Operator Borrower County UCC-1").  The Operator Borrower County UCC-1 names Original Lender as the secured party and Operator Borrower as the debtor.

22.     To further perfect its interest in the Collateral:

a.      On September 3, 2019, Original Lender filed a Uniform Commercial Code Financing Statement with the New York State Department of State ("Dept. of State") as File No. 201909030403150 (the "Owner Borrower State UCC-1").  The Owner Borrower State UCC-1 names Original Lender as the secured party and Owner Borrower as the debtor; and

b.      On September 3, 2019, Original Lender recorded a Uniform Commercial Code Financing Statement with the Dept. of State as File No. 201909030403162 (the "Operator Borrower State UCC-1").  The Operator Borrower State UCC-1 names Original Lender as the secured party and Operator Borrower as the debtor.

23.     In order to induce Original Lender to give the Loan and to further secure its repayment, Guarantors executed a Limited Recourse Guaranty of Recourse Obligations dated September 3, 2019 (the "Guaranty"), wherein and whereby they irrevocably, absolutely and unconditionally guaranteed the full, prompt and complete payment when due of the Guaranteed Obligations of Borrower (as defined in the Guaranty) (The Loan Agreement, the Note, the

6

Mortgage, the Owner Borrower County UCC-1, the Operator Borrower County UCC-1, the Owner Borrower State UCC-1, the Operator Borrower State UCC-1, the Guaranty, and all related loan documents shall be referred to collectively herein as the "Loan Documents").[2]

**B.**    **Assignment of the Loan Documents to Interim Holder**

          24.    Original Lender executed an allonge to the Note  (the "Interim Allonge"), indorsed in favor of Tuebor TRS II LLC (the "Interim Holder"), and delivered the Note, with the Interim Allonge affixed thereto, to Interim Holder.  By virtue of this delivery, Original Lender transferred to Interim Holder all of its rights, title, and interest in and to the Note and Interim Holder became the assignee and holder of the Note.

          25.    Original Lender also executed and delivered an Assignment of Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 6, 2019 (the "Interim Assignment of Mortgage") in favor of the Interim Holder pursuant to which Original Lender transferred to the Interim Holder all rights, title and interest in and to the Mortgage.  By virtue of the Interim Assignment of Mortgage, the Interim Holder became the holder of the Mortgage.  On September 18, 2019, the Interim Holder recorded the Interim Assignment of Mortgage in the City Register's Office as CRFN 2019000300939.

          26.    Original Lender also executed and delivered an Assignment of Assignment of Leases and Rents dated September 6, 2019 ad in favor of the Interim Holder (the "Holder Assignment of ALR") pursuant to which Original Lender transferred to the Interim Holder all rights, title and interest in and to the ALR.  By virtue of the Interim Assignment of ALR, the

---

[2] Capitalized terms not otherwise defined herein shall have the same meaning as ascribed in the Loan Documents.

Interim Holder became the holder of the ALR.  On September 18, 2019, the Interim Holder recorded the Interim Assignment of ALR in the City Register's Office as CRFN 2019000300940.

27.     By a Uniform Commercial Code Financing Statement Amendment filed with the City Register's Office on September 6, 2019 as CFRFN 2019000300941, Original Lender assigned the Operator Borrower County UCC-1 to Interim Holder.

28.     By a Uniform Commercial Code Financing Statement Amendment filed with the City Register's Office on September 6, 2019 as CFRFN 2019000300942, Original Lender assigned the Owner Borrower County UCC-1 to Interim Holder.

29.     By a Uniform Commercial Code Financing Statement Amendment filed with the Dept. of State on October 9, 2019 as File No. 201910090468581, Original Lender assigned the Owner Borrower State UCC-1 to Interim Holder.

30.     By a Uniform Commercial Code Financing Statement Amendment filed with the Dept. of State on October 9, 2019 as File No. 201910090468593, Original Lender assigned the Operator Borrower State UCC-1 to Interim Holder.

## C.     Assignment of the Loan Documents to Plaintiff

31.     Interim Holder executed an allonge to the Note, indorsed in blank (the "Plaintiff Allonge"), and delivered the Note, with the Plaintiff Allonge affixed thereto, to Plaintiff. By virtue of this delivery, Interim Holder transferred to Plaintiff all of its rights, title, and interest in and to the Note and Plaintiff became the assignee and holder of the Note.

32.     Interim Holder also executed and delivered an Assignment of Mortgage dated October 15, 2019 in favor of Plaintiff (the "Plaintiff Assignment of Mortgage") pursuant to which the Interim Holder transferred to Plaintiff all rights, title and interest in and to the Mortgage. By virtue of the Plaintiff Assignment of Mortgage, Plaintiff became the holder of the Mortgage.

8

On March 2, 2020, Plaintiff recorded the Plaintiff Assignment of Mortgage in the City Register's Office as CRFN 2020000079838.

33.     Interim Holder also executed and delivered an Assignment of Assignment of Leases and Rents dated August 25, 2016 in favor of Plaintiff (the "Plaintiff Assignment of ALR") pursuant to which Interim Holder transferred to Plaintiff all rights, title and interest in and to the ALR.  By virtue of the Plaintiff Assignment of ALR, Plaintiff became the holder of the ALR. On March 2, 2020, Plaintiff recorded the Plaintiff Assignment of ALR in the City Register's Office as CRFN 2020000079839.

34.     By a Uniform Commercial Code Financing Statement Amendment filed with the City Register's Office on October 15, 2019 as CFRFN 2020000079840, Interim Holder assigned the Operator Borrower County UCC-1 to Plaintiff.

35.     By a Uniform Commercial Code Financing Statement Amendment filed with the City Register's Office on October 15, 2019 as CFRFN 2020000079841, Interim Holder assigned the 36th Inc. County UCC-1 to Plaintiff.

36.     By a Uniform Commercial Code Financing Statement Amendment filed with the Dept. of State on April 20, 2020 as File No. 202004208161393, Interim Holder assigned the 36th Inc. State UCC-1 to Plaintiff.

37.     By a Uniform Commercial Code Financing Statement Amendment filed with the Dept. of State on April 20, 2020 as File No. 202004208161418, Interim Holder assigned the Operator Borrower State UCC-1 to Plaintiff.

38.     Plaintiff is the present owner and holder of the Loan and the Loan Documents, and is entitled to enforce the Note and foreclose upon the Mortgage.

**D.**     **Borrowers' Defaults Under the Loan Documents**

    **i.**     **The Payment Default**

    39.     Section 10.1(a)(i) of the Loan Agreement provides that an Event of Default shall occur if, inter alia, "any monthly installment of principal and/or interest due under the Note . . . is not paid when due."

    40.     Section 2.3.1(b) of the Loan Agreement obliges Borrowers to remit Monthly Debt Service Payments on each Monthly Payment Date beginning on October 6, 2019 and continuing until the Maturity Date.

    41.     By Notice of Event of Default and Demand for Payment dated July 20, 2020 (the "July 2020 Notice of Default"), Plaintiff, through Special Servicer, notified Borrowers that Events of Default have existed and are continuing under, inter alia, Section 10.1(a)(i) of the Loan Agreement as a result of Borrowers' failures to remit Monthly Debt Service Payments on the May 2020 Monthly Payment Date and each Monthly Payment Date occurring monthly thereafter pursuant to Section 2.3.1(b) of the Loan Agreement, revoked Borrowers' license to collect the Rents and profits generated by the Property, and demanded that they comply with their obligations under the Loan Documents.

    42.     Accordingly, an Event of Default under the Loan Documents has occurred and is continuing since May 6, 2020 under Section 10.1(a)(i) of the Loan Agreement as a result of, inter alia, Borrowers' continued failure to remit the Monthly Debt Service Payments on the May 2020 Monthly Payment Date and each Monthly Payment Date occurring monthly thereafter (the "Payment Default").

    **ii.**     **The Fraud Default**

    43.     Within Section 3.1.24 of the Loan Agreement, Borrowers represented and warranted that "since such Individual Borrower's creation, as of the date hereof and until such

10

time as the Obligations shall be paid and performed in full, each Individual Borrower has complied with, is in compliance with, and shall comply with the requirements set forth on Schedule III attached hereto."

44.     Pursuant to Schedule III(d) of the Loan Agreement, Borrowers represented and warranted, as of the date of the Loan Agreement, and covenanted and agreed in the future that, inter alia, "[n]o Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Property."

45.     Section 10.1(a)(vi) of the Loan Agreement provides that an Event of Default shall occur "if any representation or warranty made by Borrower or any Guarantor in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date such representation or warranty was made."

46.     Further, Section 10.1(a)(xi) of the Loan Agreement provides that it shall be an Event of Default "if any Individual Borrower breaches any representation, warranty or covenant contained in Sections 3.1.24 or 4.1.15 hereof or on Schedule III attached hereto[.]"

47.     Borrowers made the representations and warranties within Section 3.1.24 of the Loan Agreement despite having incurred and granted the Subordinate Mortgage as an unpermitted debt and encumbrance against the Property.

48.     Accordingly, an Event of Default has occurred and is continuing under Sections 10.1(a)(vi) and (xi) of the Loan Agreement since September 3, 2019 because Borrowers' representations and warranties in Section 3.1.24 of the Loan Agreement were false or materially misleading as of September 3, 2019, the date they were made (the "Fraud Default").

#125868779_v4 527548.00038

### iii. __The Covenant Default__

49.     Section 10.1(a)(xiii) of the Loan Agreement provides that an Event of Default shall occur "if the Property becomes subject to any . . . Lien . . . ."

50.     Section 4.1.15 of the Loan Agreement obliges Borrowers to, "at all times comply with the requirements set forth on Schedule III attached hereto and shall not take or permit any action that would result in any Individual Borrower not being in compliance with the representations, warranties and covenants set forth in Section 3.1.24 and Schedule III attached hereto."

51.     On November 15, 2019, and during the term of the Loan Agreement, Borrower obtained granted the Subordinate Mortgage to defendant NewBank despite covenanting not to do so in Schedule III(d) of the Loan Agreement.

52.     Accordingly, an Event of Default has occurred and is continuing under Sections 10.1(a)(xi) and (xiii) of the Loan Agreement since November 15, 2019 as a result of Borrowers' breaches of the covenants contained in Sections 4.1.15 of the Loan Agreement and the Property becoming subjected to the Subordinate Mortgage lien (the "Covenant Defaults").

### iv. __The Insurance Default__

53.     Pursuant to Section 5.1.1(a) of the Loan Agreement, Borrower is obligated to "obtain and maintain during the entire Term, or cause to be maintained, insurance policies [the "Policies" as defined therein] for Borrower and the Property[.]"

54.     Section 10.1(a)( ii) of the Loan Agreement provides that an Event of Default shall occur if, inter alia, "if the Policies are not . . . kept in full force and effect."

55.     By Notice of Default and Demand for Financial Information dated June 3, 2021 (the "June 2021 Notice of Default"), the Plaintiff, through counsel, notified Borrower and

12

Guarantors of, <u>inter alia</u>, Borrowers' failure to maintain insurance policies as required under section 5.1.1(a) under the Loan Agreement.

56.    Accordingly, an Event of Default under the Loan Documents has occurred and is continuing since at least February 6, 2021, the date on which the last insurance policy Borrowers maintained for the Property expired, as a result of, <u>inter alia</u>, Borrowers' failure to maintain insurance as required under Section 5.1.1(a) of the Loan Agreement (the "Insurance Default").

      **v.**    **<u>The Financial Reporting Default</u>**

57.    Section 10.1(a)(xxii)(B) of the Loan Agreement provides that it shall be an Event of Default "if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xxi) above . . . for thirty (30) days after the earlier of (1) Borrower's knowledge thereof and (2) notice to Borrower from Lender, in the case of any other Default[.]"

58.    Section 4.1.7(c)(i) of the Loan Agreement, Borrower is obliged to furnish, <u>inter alia</u>, "quarterly and year-to-date statements of income and expense and cash flow for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower, prepared in accordance with the Uniform System of Accounts" to Plaintiff "on or before the forty-fifth (45th) day after the end of each calendar quarter . . . ."

59.    By the June 2021 Notice of Default, Plaintiff, through counsel, notified Borrower and Guarantors of, <u>inter alia</u>, Borrowers' failure to provide the quarterly financial statements for the fourth quarter of 2020 and first quarter of 2021 (the "Delinquent Financial Items") under Section 4.1.7(c)(i) of the Loan Agreement.

60.    Despite receipt of the June 2021 Notice of Default, Borrower continuously failed to furnish Lender with the Delinquent Financial Items.

61.     Accordingly, an Event of Default has occurred and is continuing under Section 10.1(a)(xxii)(B) of the Loan Agreement since July 3, 2021 as a result of, <u>inter alia</u>, Borrowers' continued failure to provide the Delinquent Financial Items for thirty (30) days after the June 2021 Notice of Default (the "Financial Reporting Default").

### vi.     The Cash Management Default

62.     Pursuant to, <u>inter alia</u>, Article 6 of the Loan Agreement, Borrower is obliged to, <u>inter alia</u>, (i) maintain the Clearing Account and cause all Rents to be directly deposited therein by Tenants of the Property throughout the term of the Loan; (ii) deposit (or cause to be deposited) into the Clearing Account all Rents otherwise received within one (1) Business Day of receipt; (iii) not commingle any Rents with any other funds or property of Borrower or Manager; and (iv) upon occurrence of a Cash Management Period establish a Cash Management Account (collectively, the "Cash Management Obligations").

63.     By the June 2021 Notice of Default, Plaintiff, through counsel, notified Borrower of, <u>inter alia</u>, Borrowers' failure to uphold its Cash Management Obligations.

64.     Despite receipt of the June 2021 Notice of Default, Borrower continuously failed to uphold its Cash Management Obligations.

65.     Accordingly, an Event of Default has occurred and is continuing under Section 10.1(a)(xxii)(B) of the Loan Agreement since July 3, 2021 as a result of, <u>inter alia</u>, Borrowers' continued failure to uphold its Cash Management Obligations for thirty (30) days after the June 2021 Notice of Default (the "Cash Management Default").

### vii.    The Cessation of Operations Default

66.     Pursuant to Section 10.1(a)(xvii) of the Loan Agreement, it shall be an Event of Default "if Borrower ceases to continuously operate the Property or any material portion

14

thereof as a hotel for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken with the prior written consent of Lender)[.]"

67.     Pursuant to Section 4.1.19(b)(i) of the Loan Agreement, Borrower shall, at all times, "cause the hotel located on the Property to be operated, required and maintained as a well-maintained hotel . . . ."

68.     Upon information and belief, Borrower ceased Hotel operations at the Property in June 2020 and, to date, has not resumed such operations.

69.     Accordingly, an Event of Default has occurred and is continuing under Section 10.1(a)(xvii) of the Loan Agreement since June 30, 2020 as a result of, inter alia, Borrowers' cessation of and continuous failure to resume operations at the Property in violation of Section 4.1.19(b)(i) of the Loan Agreement (the "Cessation of Operations Default").

**E.      Plaintiff's Remedies Under the Loan Documents**

70.     Section 2.3.3 of the Loan Agreement provides, in relevant part, that "[i]f any principal, interest or any other sum due under the Loan Documents . . . is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by any Legal Requirements . . . ."

71.     Section 2.2.2 of the Loan Agreement provides, in relevant part, that "[i]n the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent permitted by law, overdue interest in respect of the Loan, shall, at Lender's election, accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, without regard to any grace or cure periods contained herein."   The Default Rate is equal to the lesser of (a) the maximum rate

15

permitted by applicable law, or (b) five percent (5%) above the Interest Rate (5.20%).  As such, the Default Rate is 10.20%.

72.     The Loan Documents further provide that, upon the occurrence of an Event of Default, the holder of the Mortgage shall be entitled to collect the rents and profits from the Property or to have a receiver appointed to take possession of the Property and to collect the rents and profits therefrom.

73.     The Loan Documents further provide that upon an Event of Default, Borrower shall be liable for all costs incurred for collecting, securing or attempting to collect or secure any amounts due under the Loan Documents, including reasonable attorneys' fees and other legal costs.

74.     By letter dated November 13, 2020 (the "Notice of Acceleration"), Plaintiff, through counsel, inter alia, notified Borrowers and Guarantors of their failure to cure the Payment Default and accelerated all sums due and owing under the Loan Documents.  To date, Borrower has not paid the amounts due under the Loan Documents.

75.     By letter dated June 3, 2021, Plaintiff, through its counsel, inter alia, provided Borrowers with an opportunity to submit a "Hardship Declaration" pursuant to the COVID-19 Emergency Protect Our Small Business Act of 2021 (NY State Senate Bill S471A) "EPOSBA".

76.     While Owner Borrower executed and returned the "Hardship Declaration" to Plaintiff's counsel on or about June 7, 2021, upon information and belief, Borrowers do not qualify for the protections under neither EPOSBA nor New York State's new legislation, made effective as of September 2, 2021, that extended the foreclosure moratorium until January 15, 2022 (NY State Senate Bill 50001).

16

77.     Despite receipt of the Notice of Acceleration, Borrowers and Guarantors have failed to cure the existing Events of Default and satisfy their obligations under the Loan Documents.

78.     There is now due, owing and payable to Plaintiff under the Loan Documents: (i) $14,072,704.22 in principal; (ii) accrued and unpaid interest at the contract and default rates; (iii) late charges; (iv) attorneys' fees, costs and expenses; (v) the Yield Maintenance Default Premium (as calculated in the Loan Agreement); and (vi) all other sums provided for under the Loan Documents.

79.     In order to protect the lien and security represented by the Mortgage during the pendency of this action, Plaintiff may be compelled to pay insurance premiums, taxes, assessments, water charges, sewer charges, attorneys' fees, repairs and other expenses or charges affecting the Property.  Plaintiff asks that any amount so paid and expended by it during the pendency of this action be added, pursuant to the Loan Documents, to its claim and, together with interest thereon from the date that such expenditures are made, and that the same be added to the amounts due Plaintiff and secured by the Loan Documents.

80.     The Defendants named herein are obligated to pay the mortgage indebtedness and/or have, claim to have, or may have some possessory or other interest in or lien upon the Property, or some part thereof, which interest or lien, if any, accrued subsequent to, and is subject and subordinate to, the lien of the Mortgage.

81.     Plaintiff has brought no other action or proceeding to recover any part of the Debt herein described.

**WHEREFORE**, Plaintiff demands judgment against the defendants as follows:

A.      Fixing the amount due to Plaintiff pursuant to the Loan Documents;

17

B.      Directing that Plaintiff be paid the amounts due pursuant to the Loan Documents, with interest, advances, other charges, attorneys' fees and costs;

C.      Adjudging that the Property be sold according to law to satisfy the amounts due to Plaintiff;

D.      Barring and foreclosing the Defendants, and each of them, from all equity of redemption in and to the Property;

E.      Awarding Plaintiff its costs of suit and attorneys' fees; and

F.      Granting such other relief as is equitable and just.

## SECOND COUNT
### (Security Interest Foreclosure)

82.      Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 81 above, as if the same were set forth and repeated at length herein.

83.      When Borrower executed the Mortgage, it granted a valid and enforceable security interest in the Collateral.

84.      Plaintiff holds a duly perfected security interest in the Collateral by virtue of the recorded Mortgage, the recorded the Mortgage, the Owner Borrower County UCC-1, the Operator Borrower County UCC-1, the Owner Borrower State UCC-1, the Operator Borrower State UCC-1, and the subsequent assignments thereof.

85.      Pursuant to the terms of the Loan Documents, Plaintiff elects to have the Collateral sold together with the Property at a single public sale.

86.      No person or entity possesses an interest in the Collateral superior to the security interest held by Plaintiff.

**WHEREFORE**, Plaintiff demands judgment against the defendants as follows:

A.      Adjudging that the Collateral be sold together with the Property at a single public sale to satisfy the amounts due to Plaintiff; and

B.      Barring and foreclosing the defendants of all equity of redemption in and to the Collateral.

## THIRD COUNT
### (Possession)

87.      Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 86 above, as if the same were set forth and repeated at length herein.

88.      By reason of Borrowers' default under the terms of the Loan Documents, Plaintiff is entitled to possession of the Property and the Collateral located.

89.      Borrower is now in possession of the Property and has deprived, and continue to deprive, Plaintiff of possession of the Property and Collateral.

**WHEREFORE**, Plaintiff demands judgment against the defendants as follows:

A.      Granting Plaintiff, its assignee or the purchaser of the Property at the foreclosure sale, possession of the Property and Collateral;

B.      Awarding Plaintiff damages for mesne profits; and

C.      Granting Plaintiff its costs of suit, including reasonable attorneys' fees.

## FOURTH COUNT
### (Appointment of a Receiver)

90.      Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 89 above, as if the same were set forth and repeated at length herein.

91.      The Leases, the Rents, the books, records, and other property relating to the ownership and operation of the Property (collectively, the "Borrowers' Assets") are the sole assets of Borrower.

19

92.     Except for certain limited qualifications as set forth in the Loan Documents, Borrower has no personal liability for repayment of the Loan, and Plaintiff's primary recourse for repayment of the Loan is the collateral securing the Loan.

93.     The Loan Documents expressly allow Plaintiff to seek, and indicate Borrowers' express consent to, the appointment of a receiver upon the occurrence of an Event of Default.

94.     Borrower and its agents are still in possession of Borrowers' Assets.

95.     Plaintiff, as an interested and secured party, is potentially threatened with material losses and injuries, including the Borrowers' Assets suffering continuous waste and a dissipation or diminution in value, if Borrower remains in control of Borrowers' Assets.

96.     Therefore, in accordance with Rule 66 of the Federal Rules of Civil Procedure, Plaintiff, as a secured creditor, asks the Court to appoint a receiver to take immediate possession of and hold, subject to the discretion of this Court, the Property and Borrowers' Assets.

**WHEREFORE**, Plaintiff demands judgment against the defendants as follows:

A.     Appointing a receiver of the Property and Borrowers' Assets;

B.     Directing all tenants in possession of the Properties to pay the appointed receiver all rent, income and profits;

C.     Awarding Plaintiff its costs of suit and attorneys' fees; and

D.     Granting such other relief as is equitable and just.

## <u>FIFTH COUNT</u>
### (Breach of Contract of the Guaranty)

97.     Plaintiff repeats and incorporates herein the allegations contained in Paragraphs 1 through 96 above, as if the same were set forth and repeated at length herein.

98.     Section 11.22(vi)(B) of the Loan Agreement authorizes Plaintiff to enforce the "liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with . . . the failure to . . . obtain and maintain the fully paid for Policies in accordance with Section 5.1 hereof . . . ."

99.     Further, pursuant to Section 11.22(B)(4) that "the Obligations shall be fully recourse to Borrower in the event that . . . Borrower fails to obtain Lender's prior written consent to any Indebtedness or any voluntary Lien encumbering the Property or any portion thereof or interest therein, except to the extent expressly permitted by the Loan Documents[.]"

100.    In order to induce Original Lender to make the Loan to Borrower, Guarantors executed, acknowledged and delivered to Original Lender the Guaranty.

101.    Pursuant to the terms of the Guaranty, Guarantors irrevocably and unconditionally covenants and agrees that he is liable for the Guaranteed Obligations, and that Guarantors shall fully perform each and every term and provision thereof.

102.    Moreover, Guarantors agreed that, with or without notice or demand, Guarantors will reimburse Plaintiff, to the extent that such reimbursement is not made by Borrower, for all expenses (including reasonable attorney's fees) incurred by Plaintiff in connection with the collection of the Guaranteed Obligations or any portion thereof or with the enforcement of the Guaranty.

103.    Plaintiff is the current holder of the Note, the Mortgage and the Guaranty.

104.    Plaintiff has brought no other action or proceeding to recover any part of the mortgage indebtedness herein described.

**WHEREFORE**, Plaintiff demands judgment against Guarantors as follows:

21

A.    Fixing the amount due to Plaintiff from Guarantors pursuant to the Guaranty and any other applicable Loan Documents;

B.    Adjudging that Plaintiff is entitled to be paid by Guarantors the amounts due pursuant to the Guaranty, with interest, advances, other charges, attorneys' fees and costs; and

C.    Awarding Plaintiff its costs of suit and attorneys' fees; and

D.    Granting such other relief as is equitable and just.

Dated: New York, New York
       January 12, 2022

**HOLLAND & KNIGHT LLP**


By: ___*/s/ Keith M. Brandofino*_____
     Keith M. Brandofino, Esq.
     David V. Mignardi, Esq.
     Attorneys for Plaintiff
       *Wilmington Trust, National Association, As*
       *Trustee For The Benefit of the Registered*
       *Holders of UBS Commercial Mortgage Trust*
       *2019-C17, Commercial Mortgage Pass-*
       *Through Certificates Series 2019-C17, acting by*
       *and through its special servicer, Rialto Capital*
       *Advisors, LLC, as Special Servicer under the*
       *Pooling and Servicing Agreement dated as of*
       *October 1, 2019*
     900 Third Avenue, 20th Floor
     New York, New York 10022
     (212) 751-3001
     keith.brandofino@hklaw.com
     david.mignardi@hklaw.com

#125868779_v4 527548.00038

**Exhibit A**
**(Property Description)**

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, CITY AND STATE OF NEW YORK, KNOWN AND DISTINGUISHED ON A MAP ENTITLED "MAP SHOWING THE SITUATION OF 144 LOTS OF LAND BEING A PART OF GLASS HOUSE FARM, THE PROPERTY OF GEORGE RAPELLE, ESQ., DRAWN BY ADOLPHUS LOSS C.S." BY THE NO. 138, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF WEST 36TH STREET, DISTANT 250 FEET EASTERLY FROM THE SOUTHEASTERLY CORNER OF 36TH STREET AND 10TH AVENUE;

RUNNING THENCE SOUTHERLY PARALLEL WITH 10TH AVENUE, 98 FEET 9 INCHES;

THENCE EASTERLY PARALLEL WITH WEST 36TH STREET, 25 FEET;

THENCE NORTHERLY PARALLEL WITH 10TH AVENUE, 98 FEET 9 INCHES TO THE SOUTHERLY SIDE OF 36TH STREET;

THENCE WESTERLY ALONG THE SOUTHERLY SIDE OF WEST 36TH STREET, 25 FEET TO THE POINT OR PLACE OF BEGINNING.

For information only:  Designated as Block 733, Lot 60, New York County, and also known as 442 West 36th Street, New York, New York

23

**Exhibit B**
**(Collateral Description)**

**36TH STREET PROPERTY INC., a New York corporation, and**
**HR 442 CORP., a New York corporation, as Debtor**

**LADDER CAPITAL FINANCE LLC, a Delaware limited liability company,**
**as Secured Party**

   a. <u>Land</u>.  The real property described in <u>Exhibit A</u> attached hereto and made a part hereof (the "**Land**");

   b. <u>Additional Land</u>.  All additional lands, estates and development rights hereafter acquired by Debtor for use in connection with the Land and the development of the Land or for any other use and all additional lands and estates therein ("**Additional Land**") which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Mortgage;

   c. <u>Improvements</u>. The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land or the Additional Land (collectively, the "**Improvements**");

   d. <u>Easements and other Beneficial Interests</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land, the Additional Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Debtor of, in and to the Land, the Additional Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

   e. <u>Equipment</u>.  All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Debtor, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Debtor and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**").  Notwithstanding the foregoing, Equipment shall not include any property belonging to Tenants under Leases except to the extent that Debtor shall have any right or interest therein;

24

       f.    Fixtures.  All Equipment now owned, or the ownership of which is hereafter acquired, by Debtor which is so related to the Land or the Additional Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements, the Land or the Additional Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Debtor's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**").  Notwithstanding the foregoing, "Fixtures" shall not include any property which Tenants are entitled to remove pursuant to Leases except to the extent that Debtor shall have any right or interest therein;

       g.    Personal Property.  All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of the Uniform Commercial Code as hereinafter defined), whether tangible or intangible, other than Fixtures, which are now or hereafter owned by Debtor and which are located within or about the Land, the Additional Land and the Improvements, together will all accessories, replacements and substitutions thereto or therefor and the proceeds thereof, including, but not limited to, all items or personal property located within or adjacent to the Improvements and included with the definition of "Property and Equipment" and "Inventories" under USALI, including, but not limited to, beds, bureaus, chiffoniers, chests, chairs, desks, lamps, mirrors, bookcases, tables, rugs, carpeting, drapes, draperies, curtains, shades, venetian blinds, screens, paintings, hangings, pictures, divans, couches, luggage carts, luggage racks, stools, sofas, chinaware, linens, pillows, blankets, glassware, silverware, uniforms, guest ledgers, foodcarts, cookware, dry cleaning facilities, dining room wagons, tools, keys other entry systems, bars, bar fixtures, liquor and other drink dispensers, icemakers, radios, television sets, intercom and paging equipment, electric and electronic equipment, dictating equipment, private telephone systems, facsimile machines, medical equipment, potted plants, heating, lighting and plumbing fixtures, fire prevention and extinguishing apparatus, cooling and air-conditioning systems, elevators, escalators, fittings, plants, apparatus, stoves, ranges, refrigerators, laundry machines, tools, machinery, engines, dynamos, motors, boilers, incinerators, switchboards, conduits, compressors, vacuum cleaning systems, floor cleaning, waxing and polishing equipment, call systems, brackets, electrical signs, bulbs, bells, ash and fuel, conveyors, cabinets, lockers, shelving, spotlighting equipment, dishwashers, garbage disposals, washers and dryers and other

customary hotel equipment, and computer software and hardware (collectively, the "**Personal Property**"), and the right, title and interest of Debtor in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of the Mortgage and all proceeds and products of any of the above;

        h.    <u>Leases and Rents</u>. All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use, enjoy or occupy all or any portion of the Land, the Additional Land and/or the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, and all right, title and interest of Debtor, its successors and assigns, therein and thereunder, including whether heretofore or hereafter entered into, whether before or after the filing by or against Debtor of any petition for relief under the Bankruptcy Code (collectively, the "**Leases**"), including, without limitation, all rents, rent equivalents, payments in connection with any termination, cancellation or surrender of any Lease, moneys payable as damages (including payments by reason of rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, income, issues and profits arising from the Leases and renewals and replacements thereof and any cash or security deposited in connection therewith and together with all rents, revenues, income, issues, registration fees, if any, fees, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits (including, without limitation, cash, letters of credit or securities deposited under Leases to secure the performance by the lessees of their obligations thereunder), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form of nature received by or paid to or for the account of or benefit of Debtor, Manager or any of their respective agents or employees from any and all sources arising from or attributable to the Property, including, without limitation, all hotel receipts, revenues and credit card receipts collected from guest rooms, restaurants, bars, meeting rooms, banquet rooms and recreational facilities, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property rendering of services by Debtor or any operator or manager of the hotel or any commercial space located in the Improvements or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits, securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales and the proceeds, if any, from business interruption or other loss of income insurance, whether paid or accruing before or after the filing by or against Debtor of any petition for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other relief to debtors, and all proceeds from the sale or other disposition of the Leases in each case (collectively, the "**Rents**"), and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment and performance of the Obligations, including the payment of the Debt;

i.  <u>Condemnation Awards</u>.  All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

j.  <u>Insurance Proceeds</u>.  All proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

k.  <u>Tax Certiorari</u>.  All refunds, rebates or credits in connection with any reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari proceedings or any other applications or proceedings for reduction of same, in each case, irrespective of the time period to which they relate;

l.  <u>Rights</u>.  The right, in the name and on behalf of Debtor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Secured Party in the Property;

m.  <u>Agreements</u>.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land, the Additional Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land, the Additional Land and any part thereof and all right, title and interest of Debtor therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Debtor thereunder;

n.  <u>Trademarks</u>.  All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records, tenants or guest lists, advertising materials, telephone exchange numbers identified in such materials and all other general intangibles relating to or used in connection with the operation of the Property;

o.  <u>Accounts</u>.  All reserves, escrows and deposit accounts maintained by Debtor with respect to the Property, including, without limitation, all accounts established or maintained pursuant to the Loan Agreement, the Cash Management Agreement, the Clearing Account Agreement or any other Loan Document, together with all deposits or wire transfers made to such accounts, and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time, and all proceeds, products, distributions, dividends and/or substitutions thereon and thereof, including, without limitation, (i) all accounts (including, without limitation, any deposit accounts), impounds, contract rights, book debts, letters of credit, letter of credit rights, supporting obligations, drafts and notes arising from the operation of a hotel on the Land and the Improvements or arising from the sale, lease or exchange of goods or other property and/or the performance of services, (ii) Debtor's rights to payment from any consumer credit/charge card organization or entities which sponsor and administer such cards as the American Express Card, the Visa Card, the Discover

27

card and the Mastercard, (iii) Debtor's rights in, to and under all purchase orders for goods, services or other property, (iv) Debtor's rights to any goods, services or other property represented by any of the foregoing, (v) monies due to or to become due to Debtor under all contracts for the sale, lease or exchange of goods or other property and/or the performance of services including the right to payment of any interest or finance charges in respect thereto (whether or not yet earned by performance on the part of Debtor) and (vi) all collateral security and guaranties of any kind given by any person or entity with respect to any of the foregoing. The foregoing shall include those now existing or hereafter created, substitutions therefor, proceeds (whether cash or non-cash, movable or immovable, tangible or intangible) received upon the sale, exchange, transfer, collection or other disposition or substitution thereof and any and all of the foregoing and proceeds therefrom;

       p.     Uniform Commercial Code Property.  All documents, instruments, chattel paper and intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and general intangibles relating to the Property;

       q.     Proceeds.  All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether in cash, or in liquidation or other claims or otherwise;

       r.     Other Rights.  Any and all other rights of Debtor in and to the items set forth in Subsections a  through q above.

All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement ("**Mortgage**") from 36TH STREET PROPERTY INC., as borrower, to LADDER CAPITAL FINANCE LLC, as lender, and recorded in the New York City Register's Office of New York County, New York.

#125868779_v4 527548.00038